Joseph **MACRINA** and Eleanor Macrina, his wife

v.

Dr. Francis J. **SMITH**.

Civ. A. No. 16505.

United States District Court E. D. Pennsylvania. Sept. 23, 1955.

Elwood S. Levy, of Richter, Lord & Farage, Philadelphia, Pa., for plaintiff.

John V. Lovitt, of Beechwood & Lovitt, Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

## I. Opinion

This case arises on a motion (filed July 27, 1955) under Fed.Rules Civ.Proc. rule 37, 28 U.S.C.A., for an order to compel the defendant to answer 17 questions which he refused to answer when his deposition was taken by plaintiffs, who are husband and wife, on July 21, 1954. The complaint alleges that on or about June 9, 1952, the defendant operated on the female plaintiff at the Osteopathic Hospital in Philadelphia and, as a result of negligence in the operation, she suffered severe, painful and permanent injuries which are described specifically in paragraph 5 of the complaint.[1]

The testimony of defendant in the deposition shows that he received, prior to 1920, degrees from two colleges of osteopathy[2], a course in anesthesia at the Leahy Clinic in the early 1940s, and had specialized in anesthesia for over 25 years prior to the operation. On the date of the operation, he inserted between the second and third lumbar vertebrae a 22-gauge needle into the spinal canal in order to give the patient a spinal anesthetic incident to a laminectomy.[3] Also, the defendant testified that this patient did not have a normal awakening but that "she started carrying on and crying and throwing herself about and so on" when she regained consciousness.[4]

■ Paragraph 4 of the motion before the Court contains this language:

"4. The sequelae suffered by the wife plaintiff and her present condition are similar to those cases in medical experience where detergent used in cleaning hypodermic needles

---

1. "* * * permanent injury to the brain with injury to its cells, nerves, tissues and functions; traumatic monoplegia and quadriplegia; traumatic spasticity; permanent and partial loss of the functions of the bowels and bladder which is progressively becoming worse; paretic and spastic condition of the left leg; injury to the limbs resulting in plaintiff assuming the position of a praying mantis; traumatic menigno-encephalomyelitis; traumatic involvement of the corticospinal, spinocerebellar and sensory tracts of the spinal cord with involvement of the parietal lobe; traumatic meningeal fibrosis; and injury to the nerves and nervous system, some or all of which plaintiff is advised are or may be permanent."

2. A course of three years was taken for the first degree and a course of one year was taken to secure the second degree.

3. Suit has also been instituted in this court by the plaintiff against the surgeon who performed the laminectomy. (C.A. 15675).

4. The defendant also testified: "But, I saw her several times after that because I happened to go into the room where she was located, as I went in to see other patients. She was in such an hysterical state I decided the best thing I could do was to stay away, because there was nothing I could do and had nothing to do with the case."

was introduced together with the anesthesia into the spinal canal."

Defendant has filed no answer to the motion, so that this statement is admitted for the purpose of this proceeding, but there is no evidence in the record (including the deposition) of the volume of detergent required to produce the consequences described in paragraph 5 of the complaint.

At the time of the defendant's testimony concerning the condition of the plaintiff upon regaining consciousness, he stated "I am through with the case when the patient regains consciousness in their room." (p. 68). When asked if a spinal tap (taken a week after the operation) showed an elevated protein count, he said "I can't for the life of me see what I have to do with this. My specialty is anesthesia" (p. 71). Counsel for the plaintiff then proceeded to ask the 17 questions covered by the motion, which will be considered under the numbers used in the motion. The possible relevance of the answers to these questions must be considered in the light of the above-described background and experience of the defendant and his slight knowledge of the patient's post-operative condition.

*Questions 1 and 2*

These questions concern meningo-encephalomyelitis. Although the defendant stated at one point that he was "familiar" with this disease, a reading of the testimony from pages 68 to 74 makes clear that he was not qualified to answer these questions about this neurological disease, which is not in his field. He apparently used the word "familiar" with the meaning that he had heard of this disease.[5]

■■ The able and helpful briefs of counsel for plaintiff demonstrate that defendant may be examined about any matters which are relevant or are reasonably calculated to lead to the discovery of admissible evidence. However, testimony on specialized medical subjects in which he had no academic (or at least none since 1920) training and no practical experience is neither relevant nor reasonably calculated to lead to the discovery of relevant evidence. It has long been recognized that expert testimony is required if answers on questions in the field of neurosis are to have probative value. Critzer v. Donovan, 1927, 289 Pa. 381, 386–387, 137 A. 665.[6] The Pennsylvania Supreme Court has also held that an osteopath is not qualified to testify in fields of medicine beyond his training and experience. Waldron v. Andrews, 1921, 270 Pa. 591, 113 A. 742. Any testimony by the defendant on the subjects of these questions would have been conjecture and, hence, neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of relevant evidence. There is nothing in the cases cited by counsel for plaintiff which is contrary to this view[7]. Questions such

5. At page 71 he testified that he knew what the condition was but that he had "never seen it in our hospital." It is clear from the testimony that he has been connected solely with this hospital for more than thirty years. It is also clear that his knowledge of the patient's post-operative condition was sketchy. In Sweeney v. Blue Anchor Beverage Co., 1937, 325 Pa. 216, 189 A. 331, 334, the alleged expert stated that he was " 'familiar with the chemical and physical forces involved in a bottle of ginger ale' " and yet the court held he was not competent to testify on the cause of breaking a bottle of carbonated beverage on

the state of the record in that case, saying, 325 Pa. at page 222, 189 A. at page 334: " 'No matter how skilled or experienced the witness may be, he will not be permitted to guess or to state a judgment based on mere conjecture.' "

6. In cases such as Pollard v. Hawfield, 1948, 83 U.S.App.D.C. 374, 170 F.2d 170, 172, the courts have held that a doctor without special training may not testify on the condition of a patient similar to the wife plaintiff suffering from paralysis and mental illness.

7. The case of Engl v. Aetna Life Insurance Co., 2 Cir., 1943, 139 F.2d 469, sum-

as No. 2 asked of a defendant such as this are probably unreasonably embarrassing within the terms of Rule 30(d), although it is clear that counsel asked them in complete good faith as a result of the defendant's use of the word "familiar."

*Questions 3, 11 and 13*

■ These questions concerning the possible consequences of accidental introduction of detergent together with spinal anesthesia into the spinal cord are questions that an experienced anesthetist, such as this defendant (who holds himself out to the public as an expert anesthetist), should certainly be competent to answer.

*Questions 4, 5, 6, 9 and 12*

■ To the extent that these questions request the doctor, as an anesthetist, to give any possible explanation of plaintiff's post-operative condition, he should answer them. By his testimony on lines 7 and 8 of page 72, the defendant has indicated that, in his opinion, the anesthesia had nothing to do with defendant's post-operative condition. However, he should answer this type of question directly, even if it is to say that there is no possible way that even a large volume of detergent in the anesthesia could have caused or contributed to the condition of the plaintiff after the operation.

*Questions 7, 14, 15, 16 and 17*

I think it is quite clear from the testimony on pages 68 to 74, referred to above, that defendant would only be

guessing if he answered question 7, which is in the neurological field. The same comment applies to questions 14 to 17, inclusive. As an anesthetist, he did not hold himself out to be qualified in the neurological field. Answers which are only conjectures are irrelevant. However, if plaintiff's counsel establishes a foundation showing that defendant has some competence in the neurological or any other field, answers to similar questions in such fields might be relevant.

*Question 8*

■ This question requires only a yes or no answer, which the defendant normally should be required to give. However, on page 68, he had answered this question as follows:

"Q. In other words, nobody in the course of the operation ordinarily would go through the covering of the spinal cord except you? A. That is right."

*Question 10*

The doctor had already testified at page 71 that this question is beyond his competence. He should not be required to guess, as a guess would be irrelevant.

■ Since defendant was justified in refusing to answer 9 of the 17 questions and the first two questions were so far from defendant's experience that they may have made him unduly reticent, this is not a proper case for an order requiring either party or either attorney to pay expenses under the terms of Rule 37 [8].

marizes with approval that portion of Rule 26(b) which states that deponent may be examined on any matter "which is relevant to the subject matter of the pending action." Rose v. Bourne, Inc., D.C.S.D.N.Y.1953, 15 F.R.D. 362, involved questions concerning royalty statements, etc., asked in an action for infringement of a copyright and Tobe Deutschmann Corp. v. United Aircraft Products, Inc., D.C.S.D.N.Y.1953, 15 F.R.D. 363, involved questions concerning misrepresentations of plaintiff in defense of an action on a contract to purchase

machinery and equipment. In the last cited case, the court only ordered certain questions after they are "limited in scope to the knowledge of the plaintiff * * *." 15 F.R.D. at page 364.

8. See, for example, Tobe Deutschmann Corp. v. United Aircraft Products, Inc., supra Note 7, cited by counsel for plaintiff in his brief. See also Grimmett v. Atchison, Topeka & Santa Fe Ry. Co., D.C.N.D.Ohio 1951, 11 F.R.D. 335; and Burnham Chemical Co. v. Borax Consolidated, Ltd., D.C.N.D.Cal.1947, 7 F.R.D. 341.

## 258

### II. Order

The defendant is ordered to answer questions numbered 3 to 6, inclusive, 9, and 11 to 13, inclusive, in accordance with the terms of the foregoing opinion, upon resumption of the deposition after reasonable notice to defendant. Upon resumption of the deposition, plaintiff's counsel shall not be limited to the questions which defendant is hereby ordered to answer, and to defendant's answers thereto, but may inquire further into such matters, which are consistent with the foregoing opinion, as may be related to any of defendant's answers as given upon resumption of the deposition.