Nina E. WILLIAMS

v.

THOMAS JEFFERSON UNIVERSITY

and

David M. Goodner, M.D.

Civ. A. No. 70–2902.

United States District Court,
E. D. Pennsylvania.

Feb. 23, 1972.

Jerome H. Ellis, Philadelphia, Pa., for plaintiff.

A. Grant Sprecher and William F. Sullivan, Jr., Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

DITTER, District Judge.

In this malpractice case, both plaintiff and defendant have filed motions to compel answers to questions posed during discovery depositions.

Plaintiff alleges that on July 9, 1969, she underwent a therapeutic abortion in Jefferson Hospital, performed by David M. Goodner, M.D., a resident physician. She was discharged the next day with instructions from Dr. Goodner to call him if she experienced heavy bleeding and to return for examination in six weeks.

On July 14 she called Dr. Goodner because she was having cramps. He told her to take codeine for the pain. On Sunday, July 20 she visited the hospital because she was having cramps and bleeding that she considered to be excessive. She was seen by Dr. Carl J. DePaula, an intern in the emergency room. He told her to return on Tuesday for further examination, but she stated that she intended to go to West Virginia. He then gave her medicine to relieve the cramps and stop the bleeding.

Plaintiff went to West Virginia and on July 22 was taken to a local hospital where an emergency hysterectomy was performed. She maintains that Dr. Goodner was negligent in his methods and treatment, there was further negligence on the part of Dr. DePaula in failing to diagnose her condition properly and in allowing her to travel to West Virginia, and as a result, she has been rendered sterile and has sustained severe mental depression.

Plaintiff deposed Dr. DePaula, Roy G. Holly, M.D., Francis J. Sweeney, M.D., and Dr. Goodner. Dr. Holly is the chairman of Jefferson's Department of Obstetrics and Gynecology and Dr. Sweeney is the hospital's director.

Acting upon the instructions of counsel, the doctors refused to provide certain information. Appended to this memorandum is a page by page reference to the questions. For identification, I have numbered them. Thus, numbers 1 through 5 refer to questions posed to Dr. DePaula, numbers 6 through 22 to those to which Dr. Holly gave no reply, number 23 to a question not answered by Dr. Sweeney, and numbers 24 through 43 to questions to which Dr. Goodner did not respond.

Unquestionably the plaintiff has a right to depose these doctors, both as to facts they know and the opinions they hold. Nevertheless, an inquiry concerning the opinions of a physician is subject to certain limitations.

█ 1. The information sought must pertain to matters within the doctor's area of expertise;

2. Hypothetical questions must be based upon facts of record, for example, the testimony of a witness who has been subjected to cross examination; and

█ 3. A physician cannot be asked to give an opinion unless it is based upon a complete statement of all relevant facts: Coxe v. Putney, 26 F.R.D. 562 (E.D.Pa.1961); Beirne v. Fitch Sanitarium Inc., 20 F.R.D. 93 (S.D.N.Y. 1957); Macrina v. Smith, 18 F.R.D. 254 (E.D.Pa.1955).

█ So far as the questions to Dr. De-Paula are concerned, I consider all of them to have been improper. Some were hypothetical in nature, but based upon facts not established or an incomplete statement of facts. Others plainly went beyond the training and competence of an intern.

█ Questions 11, 14, 15, 18, and 20 posed to Dr. Holly were proper and should have been answered. Although No. 11 refers to "informed consent," a term that has legal connotations, the doctor had used the expression himself and was merely being asked to describe what he meant by it. He was not asked to define its legal meaning.

Questions 6 and 9 were too broad: Number 6 should have been related to the plaintiff in this case and not women in general, and number 9 was objectionable because it called for an answer that could amount to a medical treatise. If number 7 had been phrased to ask Dr. Holly to explain his relationship with patients being treated by interns or residents, it would have been proper. However, as propounded, the question is ambiguous and involves legal concepts beyond the training of a doctor. Question 8 is also improper because of its use of the legal term, "negligence."

Questions 10, 12, 13, 21, and 22 all called for answers that would be irrelevant. In each instance, the doctor was asked to describe what he would do in a factual setting which in some questions was not clearly defined. Even if the situation had been completely described, the standard of care to be applied in this case is that of the ordinary hospital and resident practitioner. Dr. Holly, a professor and departmental chairman, may well be a specialist whose skills exceed those of the usual physician.

Numbers 16 and 17 are hypothetical in nature, but are not founded upon a definite statement of facts. They ask what might be observed during the course of surgery. At best the answers would have to be speculative and might differ according to a variety of unstated background circumstances. The 19th question was based upon hospital reports from another institution, all of which had not been made available to Dr. Holly. It, therefore, asks him for an opinion based upon partial information.

The 23rd question in issue was posed to Dr. Francis J. Sweeney, the administrator of the hospital. It is improper because it asks him to render a medical opinion on the basis of Dr. DePaula's notes rather than upon Dr. DePaula's actual testimony or that of the plaintiff. Obviously, it is possible that Dr. DePaula did not record all he saw, all that the plaintiff told him, or the full extent of any examination which he made.

Questions 24 through 43 were propounded to Dr. Goodner. I can see no reason why he should not be required to answer numbers 33, 38, 39, 40, 41, and 42. Although there was objection to 35 and 36, I consider these questions to be appropriate. However, they were subsequently answered and therefore need not be answered again.

█ Questions 24 and 25 are hypothetical questions not based on facts of record. Numbers 26, 27, 28, 29, 31, and 32 ask for an opinion but are all based on an incomplete statement of the facts. All of these questions are therefore improper. In number 30, Dr. Goodner is asked a hypothetical question which is

founded upon Dr. DePaula's notes. A doctor should not be required to base a complex medical judgment on an intern's emergency room notes. Moreover, the obvious purpose is not to obtain information but to impeach Dr. DePaula. I consider numbers 34, 37, and 43 to be irrelevant since the effect of each is to ask Dr. Goodner whether he believes certain hospital records.

■ Defendants have also filed a motion to compel plaintiff to answer questions to which no reply was given during the taking of her deposition. This motion will be granted. Plaintiff's complaint alleges that she sustained severe mental depression as the result of the defendants' negligence. Plaintiff was unmarried at the time of the abortion and defendants' counsel sought information as to the name of the putative father and plaintiff's discussions with him about their unborn child, her social relationships, and other facts which might give insight to her emotional status. In view of the nature of the damages claimed, this is permissible inquiry and the plaintiff should answer questions of the type which were propounded to her by defense counsel.

## APPENDIX

### QUESTIONS NOT ANSWERED BY CARL J. DePAULA, M.D.

1. Page 22—Q. "I'll hand you a pad, and I'll ask you you will please sketch for me the cervix and indicate"—

2. Page 56—Q. "All right. So that in your opinion as a physician good medical practice would have required you to tell her don't go, is that right?"

3. Page 66—Q. "And if there were lacerations and stitches were used to repair them, would hospital procedure require that that be so stated in the report?"

4. Page 69—Q. "From your limited knowledge of gynecological surgery which I understand you acquired in medical school, and that's all,"—
A. Yes.
Q. —"is an incision or laceration of the cervix which is repaired by stitches something that should be noted in the operative report?"

5. Page 69—Q. "Let me ask you whether a cervix which has been perforated in the performance of a D and C and has been repaired by stitches should be described, and these events should be described in an operative report?"

### QUESTIONS NOT ANSWERED BY ROY G. HOLLY, M.D.

6. Page 12—Q. "All right; and is a pregnancy of ten weeks in your judgment considered early enough to do a therapeutic abortion?"

7. Page 17—Q. "Does that mean, sir, that under the practice of the hospital, you are in charge of and responsible for the treatment of these patients?"

8. Page 34—Q. "Would you say that these conditions are something which might occur in the absence of negligence on the part of the physician?"

9. Page 53—Q. "Now what are some of the complications which to your knowledge sometimes occur in this type of operation?"

10. Page 54—Q. "And in doing that, assume you were going to perform this operation, and you were going to obtain consent of the patient to do it, what would you tell them?"

11. Page 55—Q. "Now, what do you mean by, 'informed consent'?"

12. Page 56—Q. "Doctor, in obtaining the informed consent of a patient who is two and one half months pregnant for a D & E, do you tell her that it's possible that there may be a perforation of the cervix?"

13. Page 57—Q. "What is your practice, doctor?"

14. Page 62—Q. "Now, why did you not ask your residents to inform the patient of these as possible complications?"

15. Page 62—Q. "Doctor, did you at any time consider whether it would be advisable to instruct your residents to inform prospective patients that there was a possibility of a perforation of the cervix?"

16. Page 99—Q. "Now, doctor, I would like you to assume, sir, that there was a rent in the anterior portion of the cervical canal that extends up into the base of the bladder and on up. I'd like to ask you, sir, whether Dr. Goodner at the time of this surgery could have observed such a condition?"

17. Page 100—Q. "Would you have been able to observe it, doctor?"

18. Page 100—Q. "Doctor, you mentioned as one of the possible causes of a post—of a post-operative hemorrhage ten or eleven days after surgery being the failure to remove all of the products of conception, I think; would a rent in the cervical canal be another cause?"

19. Page 111—Q. "Well, since reading them [The Beckley Hospital Records] have you now information that causes you to feel that the treatment given to Nina Williams ought to be reviewed?"

20. Page 118—Q. "And is a consultation mandatory following the therapeutic termination of an intra-uterine pregnancy?"

21. Page 122—Q. "Right. Doctor, if you had been examining Nina Williams on July 20, 1969, when she was in the emergency room and you had found in taking the history noted on the emergency room record, and if you had examined her and found the conditions noted on that record, what would you have done?"

22. Page 122—Q. "Doctor, if likewise you had been in that same room at that time and Miss Williams had said to you that she had intended to go to West Virginia, what would you have said in reply?"

## QUESTIONS NOT ANSWERED BY FRANCIS J. SWEENEY, M.D.

23. Page 40—Q. "All right. Reading that history and the record of the physical findings, would you say that it was proper for the intern to discharge this patient without a consultation?"

## QUESTIONS NOT ANSWERED BY DAVID M. GOODNER, M.D.

24. Page 77—Q. "Doctor, if this woman had called you on July 18 and said that she was bleeding severely and using seven or eight pads a day, what would you have done?"

25. Page 78—Q. "Doctor, if you had seen her on July 20, 1969, and if she had told you that she was bleeding and using seven or eight pads a day, what would you have done?"

26. Page 80—A. "If your physical findings do not suggest bleeding such as this, proper instructions can be given to the patient and she can be told what to do. Now, many patients"—

   Q. "Excuse me, doctor, but I want to know specifically what instructions, not proper, what?"

27. Page 81—Q. "Doctor, I would like you to assume, if you will, that Nina Williams complained to you of bleeding in the amount I mentioned before; and that this was on July 20, or before; and I would like to ask whether, in your opinion, a consultation would have been indicated?"

28. Page 81—Q. "I'd like to ask whether on July 20 of that year your training and experience were sufficient to enable you to manage

that problem without consultation?"

29. Page 89—Q. "Doctor, I ask you, do the notes that you have just read, together with the diagnosis, indicate a need for a consultation?"

30. Page 89—Q. "Doctor, if you had been present on July 20 instead of Dr. DePaula, what would you have done?"

31. Page 89—Q. "What would proper medical practice require that Dr. DePaula do in view of the facts noted on that record?"

32. Page 89—Q. "If, in addition to the facts noted on this record the patient stated that she intended to travel by automobile to Beckley, West Virginia, what would proper medical practice require by way of instructions from the physician to the patient under those circumstances?"

33. Page 123—Q. "When did you first learn that Dr. DePaula had seen this patient on July 20?"

34. Page 124—Q. "Do you accept what's on their [Jefferson Emergency room form] as being true?"

35. Page 150—Q. "Are you aware of any facts as a result of which Miss Williams sustained a perforated cervix other than the operative procedure that you performed on her?"

36. Page 151—Q. "Are you aware of any cause for this condition other than the surgery that you performed?"

37. Page 151—Q. "Do you accept these diagnoses [in the Beckley Hospital record] doctor?"

38. Page 156—Q. "And what references, [in the Beckley Hospital records] specifically, are you relying on?"

39. Page 157—Q. "Now what is there of a factual nature, whether it's in this hospital record—and I'm referring to Beckley—or not, that leads you to believe it's possible that somebody else might have done something to account for this diagnosis?"

40. Page 157—Q. "Doctor, in reading the Appalachian Hospital Record, did you read any facts which, in your judgment, shed light on the question of how a perforated cervix occurred?"

41. Page 161—Q. "What leads you to believe, as a result of reading this record from West Virginia, that anybody else caused either the perforated cervix or a perforated uterus?"

42. Page 166—Q. "After the therapeutic abortion surgery that you performed on Miss Williams, how would you account for the diagnosis of an incomplete abortion?"

43. Page 167—Q. "Do you, in fact, disagree with any of the statements in the hospital record from Beckley, West Virginia?"